## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CRISTAL A. SACHS,               :
                                :
                    Plaintiff   :    No. 3:15-CV-1725
                                :
        vs.                     :    (Judge Nealon)
                                :
CAROLYN W. COLVIN, Acting       :
Commissioner of Social Security,:
                                :
                    Defendant   :

## MEMORANDUM

On September 2, 2016, Plaintiff, Cristal A. Sachs, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2] under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461 et seq. and 42

U.S.C. § 1381 et seq., respectively.  (Doc. 1).  The parties have fully briefed the

appeal.  For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's applications for DIB and SSI will be affirmed.

_____

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2.  Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her application for DIB on November 9, 2012,

and her application for SSI on December 19, 2012, alleging disability beginning

on April 15, 2012, due to a combination of Asthma, Chronic Obstructive

Pulmonary Disease ("COPD"), high blood pressure, depression, anxiety, and Post-

Traumatic Stress Disorder ("PTSD").  (Tr. 19, 173).[4]  The claim was initially

denied by the Bureau of Disability Determination ("BDD")[5] on March 15, 2013.

(Tr. 19).  On March 19, 2013, Plaintiff filed a written request for a hearing before

an administrative law judge.  (Tr. 19).  An oral hearing was held on March 6,

2014, before administrative law judge Therese Hardiman, ("ALJ"), at which

Plaintiff and an impartial vocational expert, Nadine Henzes, ("VE"), testified.  (Tr.

19).  On May 16, 2014, the ALJ issued a decision denying Plaintiff's claims

because, as will be explained in more detail infra, Plaintiff was capable of

---

3. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on November 18, 2015.  (Doc. 11).

5. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

performing full range of light work.  (Tr. 16).

On June 30, 2014, Plaintiff filed a request for review with the Appeals Council.  (Tr. 13-14).  On July 2, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-6).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on September 2, 2015.  (Doc. 1).  On November 18, 2015, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 10 and 11).  Plaintiff filed a brief in support of her complaint on February 25, 2016.  (Doc. 15).  Defendant filed a brief in opposition on March 28, 2016.  (Doc. 17).  Plaintiff filed a reply brief on April 15, 2016.  (Doc. 18).

Plaintiff was born in the United States on September 2, 1969, and at all times relevant to this matter was considered a "younger individual."[6]  (Tr. 161).  Plaintiff obtained her GED, and can communicate in English.  (Tr. 41, 172).  Her employment records indicate that she previously worked as a clerk in the post office, a customer service representative, and a switchboard operator.  (Tr. 163).

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  <u>See</u> Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

In a document entitled "Function Report - Adult" filed with the SSA on December 2, 2012, Plaintiff indicated that she lived in a house with her children. (Tr. 198).  When asked to describe how her illnesses, injuries or conditions limited her ability to work, Plaintiff stated:

> Can't do basic activities like walking, cooking, most of the time taking care of myself.  I have constant, chronic worry that causes significant distress, it disturbs my life with any and everyone.  I have random panic attacks and persistent worry of another panic attack and also I have feelings of terror.  I have ongoing and recurring nightmares, flashbacks, or emotional numbing relating to traumatic events that happened in my life. Childhood physical, emotional, and sexual abuse.  Flashbacks, hallucinations and nightmares.  I was molested by 4 of my uncles over and over and over and over and over from the age of 8 to 16.  At 16 my cousin raped me.  I watched my father beat my mother for years.  I seen so much blood.  I then became a victim of domestic violence for nearly 20 years.  In and out of domestic violence shelters.  I then watched and became involved with my daughter's abusive relationship.  All of this led me to have extreme homicidal thoughts which I was hospitalized for.  Soon after I was discharged from the hospital, my Don started abusing me. So, I am now at the age of 43, mentally and physically suffering which prevents me from working.  Wheezing and shortness of breath, I feel like I'm trying to breath through a straw and always trying to catch my breath.

(Tr. 198-199).  From the time she woke up to the time she went to bed, Plaintiff took her medicine and took care of her children.  (Tr. 200).  She was able to make meals with the aid of a chair with wheels, could take care of her personal needs

4

while experiencing shortness of breath, iron, and perform household chores with the help of her children.  (Tr. 201).  She was able to walk for up to six (6) steps before needing to rest for up to a half hour.  (Tr. 204).  When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check hearing, seeing, or using hands.  (Tr. 204).

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take her medicine, and attend appointments.  (Tr. 203, 205).  She could count change, use a checkbook, pay bills, and handle a savings account.  (Tr. 202).  She could pay attention for "not long at all," she did not follow written or spoken instructions well, and she was not able to finish what she started.  (Tr. 204).  She could not handle stress or changes in routine at all.  (Tr. 205).

Socially, Plaintiff did not go outside often, but when she did, she could do so unaccompanied, but did not prefer to due to anxiety and the fear of shortness of breath.  (Tr. 202).  Her hobbies included reading the Bible and listening to Gospel music.  (Tr. 203).  In response to the question regarding whether she had problems getting along with family, friends, neighbors, or others, Plaintiff responded, "I seem to be self-conscious in the face of an uncomfortable social situation.  Fear and anxieties arise."  (Tr. 204).  When asked how she got along with authority

5

figures, she responded, "I stay to myself so I don't come in contact with them or anyone else." (Tr. 205).

At her hearing on March 6, 2014, Plaintiff testified that, regarding her mental health impairments, including Major Depressive Disorder, anxiety, and PTSD, she saw a psychiatrist every four (4) or five (5) months and a therapist every Friday. (Tr. 43-44, 51). She also attends group therapy once a week. (Tr. 44). She testified that television aggravated her psychological symptoms. (Tr. 51). She stated that she experienced psychological symptoms such as depression, anxiety, panic attacks, crying, flashbacks, and hallucinations very frequently every day, sometimes all day, and that the symptoms made it hard for her to concentrate or focus. (Tr. 51-52). She stated that these symptoms made it difficult for her to hold a job and get along with others because she had difficulty trusting anyone. (Tr. 54).

Regarding pulmonary issues, Plaintiff testified that she was hospitalized for five days for asthma and COPD two (2) to three (3) weeks before the hearing. (Tr. 45). She stated that allergies, extreme temperatures, perfume, and dust triggered her asthma. (Tr. 50-51).

In regards to activities of daily living, Plaintiff stated that she did not perform personal care tasks; did not do household chores such as cooking,

cleaning, or laundry; was able to pay her bills; and had no hobbies whatsoever. (Tr. 46). She stated that she was in bed until her children came home, at which point she would help the with homework and spend time with them talking and sitting. (Tr. 46).

In terms of physical limitations, Plaintiff stated that the heaviest thing she could pickup was her shoe; that from a seated position, she could raise her leg straight out and then put them down; that she could extend her arms forward and bring them back and reach overhead; that she could stand for about a minute, sit for long periods of time, and walk from her bed to her bathroom. (Tr. 46-47). She was able to sleep for ten (10) hours on average, but stated that her sleep was interrupted by dreams and anxiety. (Tr. 47).

In terms of medications, Plaintiff testified that, at the time of the hearing, she was taking Fluoxetine, Prozac, Neurontin, Risperdal, Singulair, Advair, Norvasc, Hydrochlothyazide, Trazadone, Lisinopril, Meloxicam, and Albuterol. (Tr. 48-49). She stated that her medications helped, but that they caused side effects. (Tr. 50).

## MEDICAL RECORDS

### A.    Mental Health Impairments

Before the relevant time period for the ALJ's decision, which was from

April 15, 2012 through May 16, 2014, on the dates of March 29 to April 4, 2012,

Plaintiff was voluntarily admitted to the Wilkes-Barre Behavioral Hospital due to

complaints of PTSD, hallucinations, and homicidal ideations.  (Tr. 530-31).  At

discharge, after being placed of medication undergoing therapy, "all of her

problems [were] adequately resolved," and her global assessment of functioning

("GAF") increased to fifty (50) to fifty-five (55).  530-31, 534).  Her last

examination revealed she was alert, had an appropriate mood and affect, was fully

oriented, had an intact memory with no intellectual limitations, and had no

hallucinations, delusions, or ideations of suicide or homicide.   (Tr. 531-534).

In May and July of 2012, Plaintiff failed to attend scheduled therapy

session.  (Tr. 381-382).  Psychiatric examinations during two separate, unrelated

Emergency Room ("ER") visits in 2012 showed normal affect, judgment, insight,

recent memory, concentration, and mentation. (Tr. 252, 265, 395, 397).

On January 8, 2013, Plaintiff began treatment with Community Counseling

Services of Northeastern Pennsylvania ("CCS") due to increased depression and

anxiety related to medical issues.  (Tr. 487, 490).  Her mental status examination

revealed she had: a neat  appearance; good hygiene; appropriate psychomotor

activity; normal speech; good eye contact; a logical thought process; a cooperative

manner; good memory, insight, and judgment; and an average intellectual ability.

8

(Tr. 490-492).  She was diagnosed with recurrent Major Depressive Disorder.  (Tr. 494).

On January 22, 2013, Plaintiff had another appointment at CCS, and reported she was "doing better" with medication.  (Tr. 487).  It was noted that she: was calm, cooperative, and fully oriented; displayed normal motor activity; was in a better mood; and had a linear thought process, good memory, average intellectual functioning, intact insight, and improving judgment.  (Tr. 487).

On January 30, 2013, Plaintiff presented to Stephen Timchak, Psy.D., for a consultative psychological examination.  (Tr. 463-68).  She described a history of anxiety, depression, and sexual abuse by family members.  (Tr. 463-65). Plaintiff was noted as being anxious, hyper-vigilant, and fidgety.  (Tr. 466).  Her examination revealed she: was alert and oriented; had intact memory; had logical and goal-directed speech; denied any hallucinations; had impaired attention and concentration; had a hypervigilant mental trend; had fair insight; and had an average to low average IQ.  (Tr. 466-467).  Her diagnoses included PTSD and Depressive Disorder, NOS, and Dr. Timchack opined that Plaintiff's prognosis was poor.  (Tr. 467).

On February 11, 2013, Plaintiff had an appointment at CCS.  (Tr. 475).  Her mental status examination revealed she had a: neatly groomed appearance; good

rapport; a depressed mood; a related affect; controlled, cooperative, and tearful behavior; normal speech; average intellect; a normal thought process and thought content; intact memory; fair insight, judgment, and motivation for treatment; and no homicidal or suicidal ideations.  (Tr. 482-483).  Her diagnosis was Major Depressive Disorder, recurrent and unspecified.  (Tr. 475, 483).  Her medications included Seroquel, Ambien, Neurontin, and Celexa.  (Tr. 484).

On March 8, 2013, Dr. Timchak completed a check-box form, where he checked boxes to indicate that Plaintiff had no impairment in handling simple instructions; a slight impairment in remembering details instructions; a moderate impairment in carrying out detailed instructions; a marked impairment in making judgments on simple work-related decisions; and marked restrictions in every category relating to social interaction and workplace adaptation.   (Tr. 461-462).

On September 20, 2013, Plaintiff underwent an initial psychiatric evaluation at Northeast Counseling Services ("NCS") due to complaints of depression and anxiety.  (Tr. 681).  Her mental status examination revealed she: was alert, ambulatory, cooperative, tearful, coherent, relevant, and oriented in three (3) spheres; and had speech of normal rate, rhythm, and volume, affect appropriate to content of thought, clear sensorium, intact memory, average intelligence, and good impulse control, judgment, and insight.  (Tr. 682).  Her Axis I diagnoses were

Depressive Disorder, Not Otherwise Specified, and PTSD.  (Tr. 682).  It was recommended that Plaintiff start Prozac and Trazodone.  (Tr. 683).

On October 7, 2013, Plaintiff had another appointment at NCS.  (Tr. 680).  Her mental status examination revealed she had: appropriate appearance; good hygiene; cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought process; intact judgment; good eye contact; and no delusions, hallucinations, or suicidal or homicidal ideations.  (Tr. 680). Plaintiff was instructed to continue taking Trazodone and to increase her Prozac dosage.  (Tr. 680).

On November 1, 2013, Plaintiff had an appointment at NCS.  (Tr. 679).  She reported that the Prozac was "helping some," but that her anxiety continued to be an issue, that she started attending group therapy, and that she continued to have many stressors.  (Tr. 679).  Her mental status examination revealed she had: appropriate appearance; good hygiene; cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought process; intact judgment; good eye contact; and no delusions, hallucinations, or suicidal or homicidal ideations.  (Tr. 679). Plaintiff was instructed to continue taking Trazodone and to increase her Prozac dosage.  (Tr. 679).

On December 13, 2013, Plaintiff had an appointment at NCS.  (Tr. 678).

11

She reported that she continued to have anxiety when she left her house, but that she did so when she needed to and that she felt group therapy was beneficial.  (Tr. 678).  Her mental status examination revealed she had: appropriate appearance; good hygiene; cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought process; intact judgment; good eye contact; and no delusions, hallucinations, or suicidal or homicidal ideations.  (Tr. 678). Plaintiff was instructed to continue taking her medications. (Tr. 678).

On January 20, 2014, Plaintiff had an appointment at NCS.  (Tr. 677).  She reported that she had run out of medication, that she was experiencing auditory hallucinations, and that she was having flashbacks and nightmares.  (Tr. 677).  Her mental status examination revealed she had: appropriate appearance; good hygiene; cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought process; intact judgment; good eye contact; and no delusions, hallucinations, or suicidal or homicidal ideations.  (Tr. 677). Plaintiff was instructed to decrease her Prozac in substitution of Risperdal.  (Tr. 677).

**B.**    **Physical Impairments**

**1.**    **Neck Condition**

On August 4, 2012, Plaintiff presented to the ER with complaints of neck and back pain after a motor vehicle accident.  (Tr. 422).  Plaintiff described her pain as dull and aching in nature and associated it with range of motion.  (Tr. 422).  On physical examination, Plaintiff' had a normal range of motion in her back and neck with tenderness, and a normal range of motions in her extremities without tenderness, swelling, or deformities.  (Tr. 423).  Plaintiff was discharged with medication and with a diagnosis of neck strain and muscle spasms.  (Tr. 425).

On October 3, 2012, during a visit to the ER for unrelated shortness of breath, it was noted that Plaintiff denied back or neck injury, pain, and weakness.  (Tr. 397).  A physical examination revealed a normal range of motion in her neck, no tenderness, and normal motor function.  (Tr. 397-398).

On November 18, 2012, Plaintiff presented to the ER after a fall with complaints of low back and hip pain.  (Tr. 437).  Plaintiff underwent a CT scan of her cervical spine which revealed moderate to severe narrowing of the C5-C6 intervertebral disc space with disc osteophyte complex with no fracture, subluxation, or prevertebral soft tissue swelling.  (Tr. 443, 454).  It was noted that her complaints of pain were disproportionate to the radiographic findings.  (Tr.

13

444).

On March 6, 2013, Plaintiff presented to the ER after she fell on the stairs, complaining of foot and back pain, but not neck pain.  (Tr. 651).  A physical examination revealed that her neck and extremities were normal, but that her back was tender.  (Tr. 655-656).  An x-ray of her back revealed no abnormalities.  (Tr. 660).  She was diagnosed with a lumbar strain and discharged.  (Tr. 653).

## 2.   **Pulmonary Impairment**

On June 20, 2012, Plaintiff presented to the ER of Wilkes Barre General Hospital due to complaints of shortness of breath.  (Tr. 251).  Her chest x-ray was normal.  (Tr. 262).  A physical examination revealed diffuse wheezing.  (Tr. 255).  Medication resolved Plaintiff's pulmonary symptoms, and Plaintiff was discharged with a diagnosis of asthma.  (Tr. 253, 255).

On October 3, 2012, Plaintiff presented to the ER at Temple University Hospital with shortness of breath.  (Tr. 395).  Her physical examination revealed Plaintiff had wheezing, a steady gait, and normal speech, and was oriented to time, person, and place and was awake and alert.  (Tr. 395).  Plaintiff received Albuterol for her shortness of breath, and was discharged the same day.  (Tr. 396).

On January 4, 2013, Plaintiff had an appointment with Tiwaah Millicent, D.O., due to complaints of asthma and COPD exacerbation.  (Tr. 507).  A physical

examination revealed no shortness of breath, and percussion with no dullness, flatness, or hyperresonance.  (Tr. 509).

On January 30, 2013, Plaintiff presented to the ER for shortness of breath. (Tr. 663).  Plaintiff underwent a CT scan for shortness of breath.  (Tr. 511).  The impression was that Plaintiff's lungs were unremarkable.  (Tr. 511).  Her discharge diagnosis was "COPD exacerbation,' and she was prescribed Prednisone.  (Tr. 668).

On April 26, 2013, Plaintiff presented to the ER due to shortness of breath. (Tr. 643).  Her physical examination revealed scattered wheezing with no respiratory distress, no egophony, and equal chest expansion; symmetrical chest movement; and equal chest expansion with no tenderness.  (Tr. 645).  Plaintiff was given Prednisone in the ER for her symptoms.  (Tr. 648).

On October 4, 2013, Plaintiff had an appointment with Dr. Sherin for shortness of breath upon ambulation.  (Tr. 606).  She reported that she had been using her Albuterol inhaler four (4) times a day.  (Tr. 606).  A physical examination revealed that Plaintiff's respiratory effort was tachypneic; that she had no rales or crackles, but did have diminished air movement and expiratory wheezing; and that she had good air entry after a nebulizer treatment.  (Tr. 608). Plaintiff's Advair dosage was increased, and she was prescribed a five (5) day

course of Prednisone.  (Tr. 609).

On October 18, 2013, Plaintiff had an appointment with Dr. Sherin after a recent asthma attack.  (Tr. 602).  Plaintiff reported that she felt much better after a recent course of Prednisone and an increased Advair dosage.  (Tr. 602).  A physical examination revealed normal breath sounds; good air movement; no wheezing; and no shortness of breath.  (Tr. 604).

On December 13, 2013 Plaintiff had an appointment with Dr. Sherin for asthma exacerbation, including shortness of breath.  (Tr. 594).  Upon examination, she had: no shortness of breath; normal breath sounds; good air movement; and no wheezing.  (Tr. 596).  Pulmonary Function Tests were ordered to check her lung function.  (Tr. 596).

On January 31, 2014, Plaintiff had an appointment with Dr. Sherin for her pulmonary symptoms.  (Tr. 590).  Plaintiff reported she had "good relief" with albuterol and that she had cut back her smoking.  (Tr. 590). Pulmonary functioning tests revealed "mild restrictive lung disease with moderate decrease in DLCO." (Tr. 590, 626).  Upon examination, Plaintiff had: normal breath sounds; no shortness of breath; good air movement; and no wheezing.  (Tr. 592).

On February 2, 2014, Plaintiff presented to the ER due to shortness of breath and wheezing.  (Tr. 695).  Physical examination revealed an expiratory

wheeze, unequal chest expansion, and asymmetrical chest movement.  (Tr. 697, 707).  Plaintiff received a dual nebulizer treatments and other medications throughout her hospital stay.  (Tr. 696).  Plaintiff was discharged on February 7, 2014, after treatment, with a diagnosis of asthma exacerbation, asthmatic bronchitis, and an upper respiratory infection.  (Tr. 697, 700).  At discharge, her physical examination revealed equal expansion and air entry in the bilateral lungs with intermittent expiratory wheezing in the right upper lobe and right lower lobe.  (Tr. 702).  Plaintiff was instructed to follow-up with her primary care physician on February 17, 2014.  (Tr. 702).

## C.    **State Agency Physician Opinions**

### 1.    **Dr. Patel**

On January 7, 2013, Harshadkumar Patel, M.D., a state agency physician, performed a consultative examination of Plaintiff.  (Tr. 90-94).  He stated that Plaintiff "has asthma which is mild and intermittent" and that she had uncontrolled hypertension, and that her neck condition was "mild."  (Tr. 91-92).  which was not controlled optimally, but there was no evidence of any end organ damage.  (Tr. 92).  He also observed that, following her CT scan, treatment notes found that Plaintiff's complaints of pain were disproportionate to the clinical findings.  (Tr. 91).

## 2.   **Dr. Banks**

On March 11, 2013, Sandra Banks, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  (Tr. 92-96).  In the Psychiatric Review Technique, she opined that Plaintiff had: (1) mild restrictions in activities of daily living; (2) moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; and (3) no episodes of decompensation, each of extended duration.  (Tr. 92-93).  In the Mental Residual Functional Capacity Assessment, she opined Plaintiff: (1) had moderate limitations in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to make simple work-related decisions, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to interact appropriately with the general public, and to respond appropriately to changes in the work setting.  (Tr. 94-95).

## **STANDARD OF REVIEW**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

20

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

 "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2016.  (Tr. 21).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of April 15, 2012.

(Tr. 21).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

combination of impairments of the following: "MDD, depressive disorder, PTSD

(404.1520(c)) and 416.920(c))."  (Tr. 22-23).

At step three of the sequential evaluation process, the ALJ found that

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 24-26).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with limitations.  (Tr. 51-55).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: occasional climbing but never on ladders; avoid temperature extremes, humidity and fumes; is limited to simple routine tasks, low stress as defined as only occasional decision making and only occasional changes in the work setting; and no interaction with the public and only occasional interaction with co-workers.

(Tr. 26).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))."  (Tr. 30-32).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between April 15, 2012, the alleged onset date, and the date of the ALJ's decision.  (Tr. 32).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erroneously found Plaintiff's degenerative disc disease of the cervical spine, asthma, and obesity non-severe, and thus overestimated her RFC; (2) The ALJ erroneously assigned little weight to the assessment of the examining psychologist which, if credited, would have compelled a finding of disability; (3) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations to the VE; and (4) the ALJ erred in his credibility determination of Plaintiff.  (Doc. 15, pp. 3, 5-15) .  Defendant disputes these contentions.  (Doc. 17, pp. ).

### 1.    Step Two- Neck Impairment, Asthma, and Obesity

Plaintiff asserts that the ALJ erred in finding Plaintiff's neck impairment, asthma, and obesity to be non-severe in violation of Social Security Regulation ("SSR") 96-3p because this impairment was more than a slight abnormality that had more than a minimal effect on his ability to do basic work activities.  (Doc. 15, pp. 5-9).

Step Two "'is a threshold analysis that requires [a claimant] to show that he has one severe impairment.'"  Traver v. Colvin, 2016 U.S. Dist. LEXIS 136708, at

*29 (M.D. Pa. Oct. 3, 2016) (Conaboy, J.) (citing Bradley v. Barnhart, 175

F.App'x 87 (7th Cir. 2006)).  SSR 96-3p states that an impairment is considered

severe if it "significantly limits an individual's physical or mental abilities to do

basic work activities."  SSR 96-3p.  An impairment is not severe if it is a slight

abnormality that has no more than a minimal effect on the Plaintiff's ability to do

basic work activities.  Id.  The United States Court of Appeals for the Third

Circuit has held that as long as the ALJ finds at least one (1) impairment to be

severe at Step Two, that step is resolved in Plaintiff's favor, the sequential

evaluation process continues, and any impairment that is found to non-severe is

harmless error because the ALJ still has to consider all impairments, both severe

and non-severe, in the RFC analysis.  See 20 C.F.R. §§ 404.1545(a)(2),

416.945(a)(2); see also Salles v. Commissioner of Social Security, 229 F. App'x

140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [the plaintiff's] favor at

Step Two, even if he had erroneously concluded that some of her other

impairments were non-severe, any error was harmless." (citing Rutherford v.

Barnhart, 399 F.3d 546, 553 (3d Cir. 2005))); Popp v. Astrue, 2009 U.S. Dist.

LEXIS, *4 (W.D. Pa. April 7, 2009) ("The Step Two determination as to whether

Plaintiff is suffering from a severe impairment is a threshold analysis requiring the

showing of only one severe impairment . . . In other words, as long as a claim is

not denied at Step Two, it is not generally necessary for the ALJ to have specifically found any additional alleged impairment to be severe.") (citations omitted).

In the case at hand, the ALJ found several of Plaintiff's impairments to be severe at Step Two, and thus resolved this step in Plaintiff's favor and continued the sequential evaluation process.  (Tr. 22-23).  The ALJ completed all five (5) steps of the sequential evaluation process, and in the RFC section, accounted for the opined limitations caused by Plaintiff's asthma and obesity as the ALJ limited Plaintiff to occupations that involved "occasional climbing but never on ladders; avoid temperature extremes, humidity and fumes; is limited to simple routine tasks, low stress as defined as only occasional decision making and only occasional changes in the work setting; and no interaction with the public and only occasional interaction with co-workers."  (Tr. 26).   Regarding Plaintiff's neck impairment, there was nothing in the record by way of medical evidence or opinion that Plaintiff had resulting limitations.  In fact, as discussed by the ALJ in his opinion, Plaintiff's physical examinations consistently revealed a normal range of motion and motor function without tenderness, swelling, or deformities in her neck, and that Plaintiffs's "complaints [about her neck were] disproportionate to the radiographic findings."  (Tr. 23, 397-398, 423, 425, 444).

As such, because the sequential evaluation process continued past Step Two and because the ALJ took all of Plaintiff's impairments, both severe and non-severe, into account when determining the RFC, substantial evidence supports the ALJ's decision at Step Two, and the decision will not be disturbed on appeal based on this assertion.

### 2.   Opinion Evidence

Next, Plaintiff asserts that the ALJ erroneously assigned little weight to the assessment of the examining psychologist, Dr. Timchack, which, if credited, would have compelled a finding of disability.  (Doc. 15, pp. 9-12).  In support of this argument, she states that the ALJ gave erroneous reasons for giving this opinion little weight, and that Dr. Timchack was correct that she had marked limitations.[8]  (Id.).

The responsibility for deciding a claimant's RFC rests with the administrative law judge.   See 20 C.F.R. § 404.1546.  In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals

---

[8]. Regarding the portion of Plaintiff's argument that she was hospitalized for her mental health impairments, this Court finds that the ALJ did not err in not taking the hospitalization(s) into account because they did not occur during the relevant time period.

and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."  Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances."  SSR 96-6p, 1996 SSR LEXIS 3.  This regulation does not define "appropriate circumstances," but

gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).   The Third Circuit has not upheld any instance, in any precedential opinion, in which an administrative law judge has assigned less than controlling weight to an opinion rendered by a treating physician and more weight to an opinion from a non-treating, non-examining examiner who did not review a complete case record.   See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011) (holding that the administrative law judge did not err in affording more weight to a medical opinion rendered by a non-examining physician because the physician testified at the oral hearing and had a chance to review the entire case record); Brownawell v. Commissioner of Social Security, 554 F.3d 352 (3d Cir. 2008) (holding that three (3) non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory' and omitted significant objective findings promulgated after the non-treating opinions were issued); Morales, 225 F.3d at 314 (holding that remand was proper because the claimant's residual functional capacity was based on an opinion rendered by a non-treating, non-examining physician who "review[ed] [claimant's] medical record which . . . did not include [two physicians'] reports"

and was thus based on an incomplete medical record).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

On January 30, 2013, Plaintiff presented to Stephen Timchak, Psy.D., for a consultative psychological examination.  (Tr. 463-68).  Her mental status examination revealed she: was alert and oriented; had intact memory; had logical and goal-directed speech; denied any hallucinations; had impaired attention and concentration; had a hypervigilant mental trend; had fair insight; and had an average to low average IQ.  (Tr. 466-467).  Her diagnoses included PTSD and Depressive Disorder, NOS, and Dr. Timchack opined that Plaintiff's prognosis was poor.  (Tr. 467).

On March 8, 2013, Dr. Timchak completed a check-box form, where he checked boxes to indicate that Plaintiff had no impairment in handling simple instructions; a slight impairment in remembering details instructions; a moderate impairment in carrying out detailed instructions; a marked impairment in making judgments on simple work-related decisions; and marked restrictions in every category relating to social interaction and workplace adaptation.   (Tr. 461-462).

In the case at hand, the ALJ gave some weight to the portion of Dr. Timchack's opinion that Plaintiff had no to moderate limitations in her ability to understand, remember, and carry out instructions, and little weight to the portion of the opinion that Plaintiff had marked limitations in her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.

32

(Tr. 29).  The ALJ's reasoning was that these latter portions should be given little weight because Dr. Timchack was not a treating physician and because his findings were not supported by the medical evidence, but rather Plaintiff's self-reported symptoms.  (Tr. 29).  Instead, the ALJ gave great weight to the opinion of Dr. Banks because it was more consistent with the record.

Upon review of the record and the ALJ's reasoning, it is determined that substantial evidence supports the ALJ's decision to give little weight to a portion of Dr. Timchack's opinion because the ALJ provided sound reasoning supported by the medical evidence.  As such, the ALJ's decision will not be disturbed on appeal based on this assertion.

### 3.        Hypothetical Question Presented to the Vocational Expert

Plaintiff asserts that the hypothetical questions posed to the VE were flawed because they did not include limitations relating to her neck impairment, asthma, obesity, and some of her mental health impairments.  (Doc. 15, pp. 12-13).

The United States Court of Appeals for the Third Circuit has held in that a hypothetical question must include all of a claimant's functional limitations which are supported by the record.  Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir. 2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  A hypothetical that omits limitations is

defective, and the answer thereto cannot constitute substantial evidence to support denial of a claim.  Ramirez, 372 F.3d at 553-55.  However, "[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). When an ALJ's hypothetical question to a vocational expert sets forth the Plaintiff's limitations, as supported by the record, the vocational expert's response may be accepted as substantial evidence in support of the ALJ's determination that the Plaintiff is not disabled.  See Chrupcala, 829 F.2d at 1276.

As discussed, ALJ took these aforementioned impairments and the limitations they caused as opined in the medical record into account when determining the RFC.  To reiterate, the ALJ accounted for the limitaitons caused by Plaintiff's asthma, obesity, and mental health impairments as the ALJ limited Plaintiff to occupations that involved "occasional climbing but never on ladders; avoid temperature extremes, humidity and fumes; is limited to simple routine tasks, low stress as defined as only occasional decision making and only occasional changes in the work setting; and no interaction with the public and only occasional interaction with co-workers." (Tr. 26).  Regarding Plaintiff's neck impairment, there was nothing in the record by way of medical evidence or opinion that Plaintiff had resulting limitations.  In fact, as discussed by the ALJ in

his opinion, Plaintiff's physical examinations consistently revealed a normal range of motion and motor function without tenderness, swelling, or deformities in her neck, and that Plaintiffs's "complaints [about her neck were] disproportionate to the radiographic findings." (Tr. 23, 397-398, 423, 425, 444).

The ALJ then presented a supported RFC determination to the VE, and the VE provided a response. As such, because the ALJ presented a proper RFC determination to the VE, substantial evidence supports the hypothetical questions posed to the VE, and the ALJ's determination will not be disturbed on appeal based on this assertion.

### 4. **Credibility Determination**

Plaintiff asserts the ALJ erred in determining Plaintiff was not fully credible in violation of 20 C.F.R. § 404.1529 ( c) and SSR 96-7p. (Doc. 15, pp. 13-16). She asserts that the ALJ's credibility assessment was improper because it was based on the ALJ's perception of Plaintiff's tearfulness at the hearing and the fact that Plaintiff received unemployment compensation benefits. (Id.).

As part of Step Four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to

work." <u>Hartranft</u>, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  This

"requires the ALJ to determine the extent to which a claimant is accurately stating

the degree of pain or the extent to which he or she is disabled by it." <u>Id.</u>  In

evaluating the intensity and persistence of a claimant's symptoms, an ALJ should

consider: (1) the claimant's history; (2) medical signs and laboratory findings; (3)

medical opinions; and (4) statements from the claimant, treating and non-treating

sources, and other persons about how the claimant's symptoms affect him/her.

<u>See</u> 20 C.F.R. § 404.1529.  Importantly, "[a]n individual's statements about the

intensity and persistence of pain or other symptoms or about the effect the

symptoms have on his or her ability to work may not be disregarded solely

because they are not substantiated by objective medical evidence."  1996 SSR

LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are

to be accorded great weight and deference, particularly since an ALJ is charged

with the duty of observing a witness's demeanor and credibility.'" <u>Fell v. Astrue</u>,

2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting

<u>Walters v. Commissioner of Social Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997));

<u>Frazier v. Apfel</u>, 2000 U.S. Dist. LEXIS 3105 (E.D. Pa. Mar. 6, 2000).  "'The

credibility determinations of an administrative judge are virtually unreviewable on

appeal." <u>Hoyman v. Colvin</u>, 606 Fed. App'x 678, 681 (3d Cir. 2015) (citing

<u>Beiber v. Dep't of the Army</u>, 287 F.3d 1358, 1364 (Fed. Cir. 2002)).

Social Security Ruling 96-7p gives the following instructions in evaluating

the credibility of the claimant's statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p.  "In particular, an ALJ should consider the following factors: (1) the

plaintiff's daily activities; (2) the duration, frequency and intensity of the

plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication taken to alleviate the

symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any

measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's

prior work record; and (8) the plaintiff's demeanor during the hearing." <u>Jury v.

Colvin</u>, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20

C.F.R. § 404.1529(c)(3)).

In assessing Plaintiff's credibility in this case, the ALJ stated:

> [Plaintiff]'s lack of candor, her application and receipt of
> unemployment benefits, her level of activity, her benign
> findings and routine conservative care are not consistent with a
> find of disability and undermine her credibility.
>
> .....................................................................................................
>
> After careful consideration of the evidence, the undersigned
> finds that [Plaintiff]'s medically determinable impairments
> could reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff]'s statements concerning the intensity,
> persistence, and limiting effects of these symptoms are not
> entirely credible for the reasons explained in this decision.  The
> record evidence simply fails to support [Plaintiff]'s alleged
> degree of incapacity.

(Tr. 27-28).  The ALJ discussed the medical record highlights in support of her

credibility determination, including, but not limited to, Plaintiff's scant treatment

with a treating physician and the largely normal mental status and physical

examination findings.  (Tr. 26-30).  In terms of Plaintiff's activities of daily living,

the ALJ noted that Plaintiff testified in her Adult Function Report that she was

able to perform some household chores, take care of her children, handle money,

and read.  (Tr. 26-27).  Thus, aside from mentioning Plaintiff's lack of candor at

the hearing, it is evidence that the ALJ considered the aforementioned Jury factors

in his analysis, including daily activities, treatment and measures used to relieve

symptoms, and the duration, frequency and intensity of Plaintiff's symptoms,

which is evident in the resulting restrictive RFC finding.  Additionally, contrary to

Plaintiff's assertion, "it was entirely proper for the ALJ to consider that

[Plaintiff's] receipt of unemployment benefits was inconsistent with a claim of

disability during the same period."  Myers v. Barnhart, 57 Fed. Appx. 990, 997 (3d

Cir. 2003).

Upon review of the record and the ALJ's credibility determination, it is

determined that there is substantial evidence to support the ALJ's credibility

finding of Plaintiff.  The ALJ is correct that there were enough inconsistencies in

the record regarding Plaintiff's self-reported limitations that weakened her

credibility, including the benign examination findings and Plaintiff's self-reported

activities of daily living.  Furthermore, the ALJ did not find Plaintiff to be not

credible, but only not entirely credible.  (Tr. 20).  The RFC finding is evidence

that ALJ found Plaintiff credible to some degree, albeit not completely, as the ALJ

concluded Plaintiff could perform work with only "occasional climbing but never

on ladders; avoid temperature extremes, humidity and fumes; is limited to simple

routine tasks, low stress as defined as only occasional decision making and only

occasional changes in the work setting; and no interaction with the public and only

occasional interaction with co-workers."  (Tr. 26).  By evaluating the extent to

which Plaintiff's subjective complaints were reasonably consistent with the

objective medical evidence, the credibility analysis was proper.  See Blue Ridge Erectors v. Occupational Safety & Health Review Com'n, 261 Fed. Appx. 408, 410 (3d Cir. 2008) (quoting St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) ("[T]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable.")).  As such, because the ALJ's credibility determination is to be accorded great deference and is supported by substantial evidence, the ALJ's decision will not be disturbed on appeal based on Plaintiff's assertion.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied, the decision of the Commissioner will be affirmed, judgment will be entered in favor of Defendant and against Plaintiff, and the Clerk of Court will be directed to close this matter.

A separate Order will be issued.


**Date:** March 26, 2017

**/s/ William J. Nealon**
**United States District Judge**